**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Smart & Company, Inc.,                                       Civil No. 08-5079 (DWF/RLE)

        Plaintiff,

v.                                                                     **MEMORANDUM OPINION**
**AND ORDER**

Food Systems Global Company Limited,

        Defendant.

_____

Sidney J. Spaeth, Esq., Michael T. Andrews, Esq., and Michael S. Raum, Esq., Vogel
Law Firm, counsel for Plaintiff.

Joseph A. Wetch, Jr., Esq., and Berly D. Nelson, Esq., Serkland Law Firm, and F. Scott
LeRoy, Esq., Evans, LeRoy & Hackett, PLLC, counsel for Defendant.

_____

**INTRODUCTION**

This matter is before the Court on the motion to dismiss brought by Defendant

Food Systems Global Company Limited ("FSG") and the request by Plaintiff Smart &

Company, Inc. ("Smart") for injunctive relief.[1]  For the reasons set forth below, FSG's

motion is denied and Smart's request for injunctive relief is granted in part and denied in

part.

_____

[1]     The Court received briefs and heard argument in this matter on an expedited basis.
The day before the hearing in this matter, Smart filed a motion for leave to file a brief and
declaration addressing issues to be presented to the Court and attached as exhibits the
documents it sought to file.  The Court reviewed these documents in connection with its
consideration of this matter and grants Smart's motion.

**BACKGROUND**

This case concerns a breach of contract dispute between Smart and FSG.  The

parties entered into a contract (the "Sales Agreement") on August 3, 2007, pursuant to

which FSG agreed to sell to Smart the components (the "Goods") of a system to produce

baked, stackable potato chips (the "System").  The Sales Agreement called for FSG to

acquire the Goods from various manufacturers and suppliers.  The Goods were to be

shipped to the United States and installed in a new factory in Mahnomen, Minnesota.

Some of the Goods were provided to Smart, but others were not, and the parties

each allege that the other has breached the contract.  FSG alleges that Smart breached the

contract by paying vendors directly, rather than by paying all amounts due to FSG, which

FSG indicates caused its lenders to tighten or reduce its credit terms.  Smart alleges that

FSG repudiated the contract by demanding that Smart enter into a new contract with

renegotiated terms, that Smart had concerns about FSG's performance, and that Smart

was required to cover in order to obtain the necessary parts to complete the System from

other vendors.

The parties engaged in negotiations for several months, but were unable to reach a

resolution of their dispute.  Smart filed suit in state court in Becker County, Minnesota

against FSG on August 1, 2008, and the same day obtained an ex parte temporary

restraining order ("August TRO") barring FSG from disposing of Goods to other buyers.

Smart then sought to modify the August TRO, but FSG removed the case to this Court on

the basis of diversity between the parties prior to the state court's hearing on Smart's

request.

Smart now seeks injunctive relief, either in the form of a temporary restraining order or preliminary injunction, directing FSG to obtain the final necessary component of the System required for operation and deliver it to Smart.  This component is being manufactured by Rademaker B.V. ("Rademaker"), a company in the Netherlands with which FSG has a contract.  Smart does not have a contract with Rademaker, but has paid a substantial amount of the price for the component to Rademaker directly.  Smart argues that it will be irreparably harmed if it is unable to obtain this component because the Mahnomen factory will not open, resulting in Smart's financial ruin.

FSG claims that this Court lacks personal jurisdiction over it and that the Court must dismiss the case.  FSG further contends that equitable relief is not warranted because the harm to Smart can be liquidated and paid by money damages, giving Smart an adequate remedy at law.

## DISCUSSION

### I.  Personal Jurisdiction

### A.  Standard and Requirements for Establishing Personal Jurisdiction

When a defendant challenges personal jurisdiction, the plaintiff has the burden to show that personal jurisdiction exists.  *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (citing *Gould v. P.T. Krakatau Steel*, 957 F.2d 573, 575 (8th Cir. 1992)).  To survive a motion to dismiss for lack of personal jurisdiction, however, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant.  *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE),*

*Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (citing *Northrup King Co. v. Compania*

*Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir. 1995)).

When considering whether personal jurisdiction exists, the court may consider

matters outside the pleadings; "the court may inquire, by affidavits or otherwise, into the

facts as they exist." *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir. 1998) (quoting *Land*

*v. Dollar*, 330 U.S. 731, 735 n.4 (1947)). For the purposes of determining whether the

plaintiff has made a prima facie showing of personal jurisdiction, the court must view the

evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the

plaintiff's favor. *Digi-Tel*, 89 F.3d at 522 (citing *Dakota Indus., Inc. v. Dakota*

*Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)).

In determining whether a court has personal jurisdiction over a non-resident

defendant, a court must ordinarily satisfy both the requirements of the state long-arm

statute and of federal due process. *Id.* (citing *Northrup King*, 51 F.3d at 1387). The

Minnesota long-arm statute extends jurisdiction to the maximum limit consistent with

due process, and therefore a court in Minnesota need only evaluate whether the

requirements of due process are satisfied. *Wessels, Arnold & Handerson v. Nat'l Med.*

*Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995). When analyzing most personal

jurisdiction questions in Minnesota, courts may simply apply the federal standards.

*Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 411 (Minn. 1992).

Federal due process requires that a defendant have "certain minimum contacts"

with the forum state such that "maintenance of the suit does not offend traditional notions

of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)

(internal quotations omitted).  The defendant's conduct and connection with the forum

state must be such that the defendant should reasonably anticipate being haled into court

there.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  It is

essential in each case that the defendant has purposefully availed itself of the privilege of

conducting activities within the forum state, thus invoking the benefits and protections of

its laws.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v.

Denckla*, 357 U.S. 235, 253 (1958)).

A court may use one of two different analyses to determine whether the

defendants' contacts with the forum state establish personal jurisdiction.  *Epps v. Stewart

Info. Servs. Corp.*, 327 F.3d 642, 648 (8th Cir. 2003).  In a general jurisdiction case, a

defendant maintains such "continuous and systematic" contacts with a state that it

becomes subject to the jurisdiction of that state's courts for any purpose.  *Morris v.

Barkbuster, Inc.*, 923 F.2d 1277, 1281 (8th Cir. 1991) (quoting *Helicopteros Nacionales

de Columbia v. Hall*, 466 U.S. 408, 414 n.9, 416, 418–19 (1984)); *Valspar*,

495 N.W.2d at 411.  Specific jurisdiction, on the other hand, requires that the defendant

has "purposely directed" its activities at residents of the forum and that the litigation

results from alleged injuries that "arise out of or relate to" those activities.  *Wessels*,

65 F.3d at 1432 (quoting *Burger King*, 471 U.S. at 472).

Regardless of which analysis is used, the Eighth Circuit applies a five-factor test in

determining whether the exercise of personal jurisdiction would pass constitutional

muster:  (1) the nature and quality of defendant's contacts with the forum state; (2) the

quantity of contacts; (3) the source and connection of the cause of action with those

contacts; and, to a lesser degree, (4) the interest of the forum state; and (5) the

convenience of the parties. *Wessels*, 65 F.3d at 1432. The first three factors are of

primary importance, while the last two are "secondary factors." *Minn. Mining & Mfg.*

*Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir. 1995). The third factor

distinguishes between specific and general jurisdiction. *Digi-Tel*, 89 F.3d at 523 n.4

(citing *Wessels*, 65 F.3d at 1432, n.4).

### B.      Personal Jurisdiction over FSG

FSG argues that this Court lacks both general and specific jurisdiction over it. The

Court agrees that general personal jurisdiction is lacking. The Court, however, concludes

that it has specific personal jurisdiction over FSG.

FSG is registered in Hong Kong and has its principal place of business in

Bangkok, Thailand. FSG does not have operations in Minnesota. Steven Twitty

("Twitty"), a director of FSG, had contact with Minnesota on two occasions. In April

2006, Twitty met with John Smart, Smart's owner, for lunch in Minneapolis during

which they discussed various projects, including the Mahnomen potato chip factory

project that is the subject of this case. Later, Twitty visited Grand Forks, North Dakota to

discuss the project and John Smart and Twitty drove to East Grand Forks, Minnesota for

lunch, where they again discussed the project. Ultimately the parties entered into the

Sales Agreement, which Twitty signed in Thailand. The Goods were manufactured by

various third parties, primarily in Europe and Asia. The Court concludes that these

contacts between FSG and Minnesota were not continuous and systematic, such that FSG

could reasonably anticipate being haled into court in Minnesota for any purpose.

FSG, however, could reasonably anticipate being haled into court in Minnesota in connection with the Sales Agreement. When considering whether personal jurisdiction exists in contract cases, a court considers the parties' prior negotiations, contemplated future consequences, and actual course of dealings, in addition to the terms of the contract. *St. Jude Medical, Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 591 (8th Cir. 2001). The Sales Agreement and future obligations contemplated thereunder for FSG provide sufficient contacts under the first three factors of the Eighth Circuit's five-factor test to satisfy the standard for specific personal jurisdiction.

Under the Sales Agreement, FSG agreed to provide the Goods which were to be incorporated into the System and installed at a factory in Minnesota. FSG also agreed, in Section 1.2 of the Sales Agreement, to provide services to Smart in Minnesota. The Sales Agreement contemplated that FSG would provide to Smart in Mahnomen: (1) a team of engineers for up to six weeks to assist in the assembly of the Goods into the System; (2) a team of engineers and technicians for up to two weeks to start and test the System; and (3) a technician for up to two weeks to train the factory's staff on how to use and operate the System. Section 5.2(a) of the Sales Agreement provided that the products produced by the System would comply with applicable state (i.e. Minnesota) law, and Section 5.3 provided that FSG would ensure that the equipment met Minnesota's food safety requirements. FSG also warranted the Goods for a one-year period after installation in Minnesota under Section 7.1 of the Sales Agreement. FSG, therefore, contemplated obtaining the manufacture of and modifying equipment to be installed in Minnesota, sending personnel here, complying with Minnesota law and regulations and, for a period

7

of one-year after the System was installed and operating, remedying problems that arose

with the System.  FSG could reasonably anticipate, should problems occur during the

contract's execution, that a dispute about the contract's terms could be litigated in

Minnesota.

Further, FSG agreed to a choice-of-law provision specifying the application of

Minnesota law.  Section 9.8 of the Sales Agreement indicates that it is to be "governed by

the laws of the State of Minnesota as such laws are applied to contracts entered into and

to be performed entirely within the State of Minnesota." (Compl., Ex. D.)  While a

choice of law provision, standing alone, is insufficient to create personal jurisdiction, it is

a relevant consideration in determining whether a defendant has purposefully availed

itself in the forum state.  *Wessels,* 65 F.3d at 1434.

The final two factors, which are accorded less weight in the Court's analysis, do

not weigh against jurisdiction here.  Minnesota, as the site of the planned factory and the

location where the Goods and services were to be provided under the Sales Agreement,

has an interest in the outcome of this dispute.  With regard to the convenience of the

parties, it is possible that no single forum would be convenient for both parties, given the

far-flung locations of FSG and some of its third party vendors.  Yet the factory was to be

located here in Minnesota, and a substantial amount of the Goods are already here.  FSG

planned to send personnel to Minnesota to assemble and start the System, to test it, and to

train Smart's staff on how to use the System for substantial periods of time.  The Court,

therefore, concludes that Minnesota is not so inconvenient a jurisdiction for FSG as to

render the Court without jurisdiction.

FSG argues that its contemplated contacts with Minnesota cannot be considered because some of these actions have not yet occurred; the relationship between the parties broke down before the time came for some of these contacts to take place. This argument ignores the principle that a contract's terms and the parties' contemplated future consequences are to be considered in determining whether personal jurisdiction exists. *St. Jude Medical,* 250 F.3d at 591. The contract's terms and FSG's contemplated future activities in Minnesota provide an adequate nexus for jurisdiction here.

FSG also argues that this Court lacks jurisdiction because Smart is not a Minnesota resident. Smart is incorporated in North Dakota. Smart clearly does business in Minnesota, however. Further, Smart does not claim the Court lacks jurisdiction over it and the Court concludes that Smart's state of incorporation is immaterial to determining whether FSG has sufficient contacts with Minnesota to be subjected to suit here.

Based on the foregoing, the Court concludes that FSG purposefully directed its activities toward Minnesota through the Sales Agreement and could reasonably expect that a dispute about the contract's terms could be litigated in Minnesota. The Court recognizes, as it noted at the hearing in this matter, that FSG's contacts with Minnesota may not rise very far above the minimum contacts necessary to establish the existence of jurisdiction here. In making its determination, however, the Court's task is not to determine the "best" forum for a suit, but to determine whether sufficient minimum contacts exist so that a suit against FSG in Minnesota does not offend traditional notions of fair play and substantial justice. The Court finds that such minimum contacts exist

here.  Therefore, the Court concludes it has personal jurisdiction over FSG and denies

FSG's motion to dismiss.

## II.     Injunctive Relief

Smart seeks injunctive relief in an effort to obtain a necessary component for the

System from Rademaker.  Smart obtained the August TRO, which prevented FSG from

selling any components to a party other than Smart, on the day it filed suit in Minnesota

state court.  The August TRO, however, was an ex parte order entered without prior

notice to FSG.  The Court concludes, and Smart agrees, that this Court is not bound by

the terms of the August TRO.

### A.     Standard of Review

A temporary restraining order may be granted only if the moving party can

demonstrate:  (1) a likelihood of success on the merits; (2) that the movant will suffer

irreparable harm absent the restraining order; (3) that the balance of harms favors the

movant; and (4) that the public interest favors the movant.  *See Dataphase Sys., Inc. v.*

*C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  None of the factors by itself is

determinative; rather, in each case the factors must be balanced to determine whether

they tilt toward or away from granting injunctive relief.  *See West Publ'g Co. v. Mead*

*Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).  The party requesting the

injunctive relief bears the "complete burden" of proving all of the factors listed above.

*Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**B.      Likelihood of Success on the Merits**

In order to obtain injunctive relief, Smart must show a likelihood that it will

succeed on the merits.  In a case such as this one, the Court must determine whether

Smart has a "fair chance of prevailing."  *See Planned Parenthood Minn., N.D., S.D. v.*

*Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (analyzing the history of this factor in Eighth

Circuit case law and clarifying that "fair chance" standard is applied by district courts in

cases other than those challenging "government action based on presumptively reasoned

democratic processes").

Smart argues that it has shown a likelihood that it will succeed on the merits as it

relates to its claim that it may obtain the Rademaker component.  Smart contends that it is

entitled to specific performance to obtain the Goods under the Uniform Commercial

Code.  Pursuant to Minn. Stat. § 336.2-716(1), a buyer may be entitled to specific

performance of a contract for the sale of goods "where the goods are unique or in other

proper circumstances."  A buyer may also be entitled to replevin "for goods identified to

the contract if after reasonable effort the buyer is unable to effect cover for such goods or

the circumstances reasonably indicate that such effort will be unavailing . . . ."  Minn.

Stat. § 336.2-716(3).

The Court agrees that Smart has shown likelihood of success on the merits as this

case relates to its ability to obtain the component being manufactured by Rademaker.

FSG agreed to provide this part to Smart in the Sales Agreement and it contracted with

Rademaker to obtain the manufacture of the part.  There is evidence before the Court that

the part is unique, in that it is being manufactured according to FSG's specifications or to

11

be modified by FSG so that it may be incorporated into the System, that it is a specific good identified to the contract, and that Smart has been unable to cover to obtain this component from another source.

### C.      Irreparable Harm

Smart must establish that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages. *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). A showing of speculative harm is insufficient to meet this burden. *Id.* Failure to show irreparable harm alone is a sufficient basis for a court to deny injunctive relief. *Gelco Corp.*, 811 F.2d at 420.

Smart has been unable to obtain the necessary component from Rademaker through its own efforts and Smart argues it will be irreparably harmed if it is unable to obtain this component. Smart argues that without this component, it is unable to complete the System and, unless it obtains the part, the factory in Mahnomen will not open. Smart argues that the Mahnomen project is its only venture at this time, and if the factory does not open within a few months, Smart will become insolvent and will close. Smart indicates that it has attempted to deal directly with Rademaker to obtain the part, has paid a substantial portion of the amount due for the part, and will pay the remainder in order to obtain the part. Smart, however, does not have a contract directly with Rademaker; Rademaker's contract is with FSG.

FSG disputes that Smart will suffer irreparable harm if the part is not delivered. FSG argues that obtaining the Rademaker part is merely a question of timing, because the part could be fabricated elsewhere in a matter of months. FSG also argues that the harm

to FSG can be calculated and reduced to money damages.  If the factory does not open in time, Smart will be required to pay damages to the Midwest Minnesota Community Development Corporation ("MMCDC"), an entity that invested in the Mahnomen project and to which Smart contracted to sell the System in connection with the operation of the factory.  FSG argues that because these damages can be liquidated, Smart can be compensated and no injunctive relief should issue because Smart has an adequate remedy at law.

The Court finds that Smart has met its burden to show irreparable harm.  If Smart is unable to open the factory because it does not have the Rademaker component, it will be forced to close.  The Court finds that this harm is not speculative, and that it is not the type of harm readily compensable by money damages, though money damages may be at issue between the parties with respect to other aspects of this suit.

### D.    Balance of the Harms

Smart asserts that the balance of the harms weighs in its favor because without injunctive relief allowing it to obtain the Rademaker component, its factory will not open and its business will fail.  Smart contends that it is also in FSG's best interest to deliver the Rademaker component to Smart because it will simply require FSG to perform under its contract with Rademaker, it will mitigate FSG's damages in the case, and this will remove an issue from the litigation.  FSG does not identify specific harms it will suffer if Smart obtains this part from Rademaker, but cautions that it should not be required to engage in activities that will harm its future relationship with Rademaker as a vendor.

The Court finds that the balance of the harms weighs in favor of granting injunctive relief to Smart.  FSG's concern goes not to the grant of injunctive relief itself, but to the scope of the relief awarded.   The Court is amply aware that Rademaker is not a party to this action and that Rademaker's absence limits the Court's reach with respect to ordering certain relief.  The Court believes, however, that it can strike a fair balance that accommodates the needs of both Smart and FSG in any award of injunctive relief.

### E.      The Public Interest

FSG contends that this matter involves a contract between private parties and that the case does not implicate the public interest.  Smart argues that the public interest weighs in favor of awarding it relief because without the part from Rademaker, the factory and the jobs it would provide will not materialize, and Smart will fail financially.

The Court concludes that there is a public interest component to this case and that this factor favors awarding injunctive relief to Smart.  In addition to the obvious public interest in the economic growth and job creation that the Mahnomen factory will offer, Minnesota public policy favors upholding valid contracts.  *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 456 (Minn. Ct. App. 2001).

### F.      Temporary Restraining Order

Based on the foregoing, the Court concludes that Smart has met its burden to show that it should obtain an award of injunctive relief regarding its pursuit of the Rademaker component of the System.  The Court has determined that a temporary restraining order is the appropriate relief at this time; both parties represented that they had engaged in negotiations with Rademaker and the situation appears to be fluid at this time.  The

Court, therefore, awards limited relief to Smart and anticipates that upon or before the

expiration of this temporary restraining order the parties may appear to request an

extension or modification of its terms.  The Court denies Smart's request for a

preliminary injunction at this time.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Leave to File Brief and Declaration (Doc. No. 20) is

**GRANTED**.

2.      Defendant's Motion to Dismiss (Doc. No. 7) is **DENIED**.

3.      Plaintiff's request for injunctive relief is **GRANTED IN PART** as follows:

   a.  The Plaintiff's request for a temporary restraining order is granted

       because the Plaintiff has demonstrated:  (1) a likelihood of success on

       the merits with respect to the component of the System it purchased

       under the Sales Agreement that is being manufactured by Rademaker

       B.V. of the Netherlands; (2) that it will suffer irreparable harm absent a

       restraining order; (3) that the balance of harms weighs in its favor; and

       (4) that the public interest favors its application for injunctive relief.

   b.  The Court awards Plaintiff a Temporary Restraining Order as follows:

       i.      Both parties shall serve a copy of this Order upon Rademaker

               B.V., with notice provided to the other party when this has been

               accomplished.

       ii.     Within forty-eight (48) hours after the entry of this order,

15

Defendant shall request from Rademaker an estimate of the time necessary to complete the component of the System Rademaker is manufacturing.  Within twenty-four (24) hours of receiving this estimated completion date from Rademaker, Defendant shall communicate the estimated completion date to Plaintiff, by correspondence in writing by Defendant's counsel to Plaintiff's counsel.

iii.   Defendant shall use its best efforts, in good faith, to obtain from Rademaker, pursuant to the contract between Rademaker and Defendant, the component of the System Rademaker is manufacturing and Defendant shall perform any necessary modifications to this component so that it meets the design specifications of the System without undue delay.  Defendant shall not engage in any activity designed to discourage Rademaker from performing the contract, completing the manufacture of the part, or performing any testing necessary before the part may be shipped.

iv.   Plaintiff shall make payment of any amounts that remain due for this part to Rademaker if Rademaker ships the part to Plaintiff, and any other amounts that would be due to Defendant related to this part shall be paid to Defendant.  If Defendant obtains the part and ships it to Plaintiff, Plaintiff shall make any remaining

16

      v.       This temporary restraining order shall expire sixty (60) days after

           it is entered.

      vi.     The Plaintiff shall post a bond in the amount of $500,000 before

           5:00 P.M. on Monday, September 29, 2008, but the Court's

           requirement that a bond be posted shall not delay any other relief

           awarded by this order.

    4.     Plaintiff's request for a preliminary injunction is **DENIED**.


Dated:  September 25, 2008           s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        Judge of United States District Court